Mary Shea Hagebols (SBN 113222)
SHEA LAW OFFICES
1814 Franklin Street, Suite 800
Oakland, CA 94612
Tel: 510-208-4422
Fax: 415-520-9407
shealaw@aol.com

Attorneys for Plaintiffs
JANE DOE and ANNE RASKIN

E-filing

FILED
OCT 14 2010
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-Oakland/San Francisco-

| | |
|---|---|
| JANE DOE and ANNE RASKIN,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; JANICE MADSEN, an individual; KYM DOUGHERTY, an individual; AUDREY HILLMAN, an individual; HEATHER GRIVES, an individual, and DOES 1-10.<br><br>Defendants. | Case No. C10-04700 EMC<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. VIOLATION OF THE FEDERAL STORED COMMUNICATIONS ACT 18 U.S.C. §§ 2701 TO 2711;<br>2. VIOLATION OF CALIFORNIA WHISTLE-BLOWING STATUTES CAL LABOR CODE §§98.6;1102.5; 6310<br>3. VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE 1, SECTION 1 (INVASION OF PRIVACY)<br>4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>5. VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT – SEX DISCRIMINATION<br>6. VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT – SE HARASSMENT<br>7. VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT – RETALIATION<br>8. VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT – FAILURE TO PREVENT DISCRIMINATION AND HARASSMENT<br><br>AMOUNT IN CONTROVERSY: $3,000,000 |

REOUEST FOR JURY TRIAL

COME NOW Plaintiffs JANE DOE and ANNE RASKIN complain against Defendants CITY AND COUNTY OF SAN FRANCISCO [Department of Emergency Management Division of Emergency Communications]; JANICE MADSEN, an individual; KYM DOUGHERTY, an individual; AUDREY HILLMAN, an individual; HEATHER GRIVES, an individual, and DOES 1-10 as follows:

## JURISDICTION

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) as the controversy arises under "the constitution, laws or treaties of the United States." This Court has authority to exercise supplemental jurisdiction over California state claims under 28 U.S.C. § 1367(a).

2. The Amount in controversy is in excess of $3,000,000.

## VENUE

3. Venue is proper in the Northern District of California pursuant to 28 U.S.C § 1391(b) because a substantial part of the acts, events or omissions giving rise to this action occurred in this District.

## PARTIES

4. Plaintiff "Jane Doe" is suing here under the pseudonym "Jane Doe" because she fears retaliation and harm to her personal safety. Plaintiff Jane Doe seeks immediate leave of Court to proceed in this litigation as "Jane Doe." Plaintiff Jane Doe will disclose her true identity to the Defendants at the time they are served with this Complaint for Damages in the matter. Plaintiff Jane Doe is a United States citizen and resident of the County of Alameda. Plaintiff Jane Doe is and was at all relevant times, an employee of the City and County of San Francisco, Department of Emergency Management, San Francisco, State of California.

5. Plaintiff Anne Raskin is a United States Citizen and resident of the County of San Mateo, State of California and is and was an employee of the City and County of San Francisco, Department of Emergency Management, San Francisco, State of California.

6. Defendant City and County of San Francisco, State of California (hereinafter as "Defendant CCSF" or "CCSF"), is a political subdivision of the State of California located within California. Defendant CCSF has created and operates the Department of Emergency Management which oversees the Division of Emergency Communications (hereinafter "DEMDEC"). Plaintiff is informed and believes that DEMDEC is a separate unit or division of Defendant CCSF, organized and existing pursuant to the rules promulgated by the CCSF.

7. Defendant Janice Madsen, is a United States citizen and resident of the State of California. Defendant Madsen is currently employed by DEMDEC. At all times relevant hereto, Defendant Madsen was supervisory employee of Defendant CCSF, acting within the course and scope of her employment with and pursuant to and under color of the authority of Defendant CCSF and/or DEMDEC. Defendant Madsen is being sued herein in her individual capacity as well as her capacity as supervisory employee of Defendant CCSF.

8. Defendant Heather Grives is a United States citizen and resident of the State of California. At all times relevant hereto, Defendant Grives was supervisory employee of Defendant CCSF, acting within the course and scope of her employment with and pursuant to and under color of the authority of Defendant CCSF and/or DEMDEC. Defendant Grives is being sued herein in her individual capacity as well as her capacity as supervisory employee of Defendant CCSF.

9. Defendant Kym Dougherty is a United States citizen and resident of the State of California. At all times relevant hereto, Defendant Dougherty was supervisory employee of Defendant CCSF, acting within the course and scope of her employment with and pursuant to and under color of the authority of Defendant CCSF and/or DEMDEC. Defendant Dougherty is being sued herein in her individual capacity as well as her capacity as supervisory employee of Defendant CCSF.

10. Defendant Audrey Hillman is a United States citizen and resident of the State of

California. At all times relevant hereto, Defendant Hillman was supervisory employee of Defendant CCSF, acting within the course and scope of her employment with and pursuant to and under color of the authority of Defendant CCSF and/or DEMDEC. Defendant Hillman is being sued herein in her individual capacity as well as her capacity as supervisory employee of Defendant CCSF.

11. Each of the DOES 1 through 10, inclusive, are so named because Plaintiffs Jane Doe and Anne Raskin do not know their true names and/or capacities at this time. Plaintiffs Jane Doe and Anne Raskin will seek leave of Court to amend this Complaint when true names and capacities of the Defendants designated herein as DOES 1 through 10 have been ascertained.

12. Plaintiffs Jane Doe and Anne Raskin are informed and believes that each Defendant herein willfully committed, ordered, directed, supervised, allowed, planned, ratified, concealed, organized, conspired or otherwise participated in the unlawful acts complained of herein.

13. Defendants, and each of them, were at all material times an "employer" within the meaning of California Government Code §12926(d), and as such were bound by the California Fair Employment and Housing Act (California Government Code §12900 et seq.) (hereinafter, "California Fair Employment and Housing Act ("FEHA")"), prohibiting it from discrimination, harassment or retaliation against any employees based on sex, and requiring them to take all reasonable steps necessary to prevent discrimination and harassment from occurring, including taking immediate and appropriate corrective action in response to unlawful conduct under the FEHA

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Plaintiffs Jane Doe and Anne Raskin filed timely charges of discrimination with the California Department of Fair Employment and Housing (hereinafter "DFEH"). The DFEH issued Right to Sue Notices on those charges. Plaintiffs Jane Doe and Anne Raskin

allege, on information and belief that these Right to Sue Notices were served on Defendants. Plaintiffs Jane Doe and Anne Raskin reserve the right to amend this Complaint when they receive Right to Sue Notices from the United State Equal Employment Opportunity Commission.

15. Plaintiffs Jane Doe and Anne Raskin filed timely claims under the California Government Tort Claims Act.

## FACTS COMMON TO CLAIMS FOR RELIEF

16. This matter involves, among other matters, whistle-blowing claims (retaliation of against Plaintiffs Jane Doe and Anne Raskin for reporting misuse of government monies, violation of federal laws regarding Stored Communications , public safety concerns) as well as claims for violation of Plaintiffs' constitutional rights, violations of state and federal laws proscribing gender-based harassment and discrimination and breach of privacy suffered by Plaintiffs while in the employment of the Defendant City and County of San Francisco, Department of Emergency Management ("DEM"), Division of Emergency Communications ("DEC").

### A. BACKGROUND: DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S DEPARTMENT OF EMERGENCY MANAGEMENT, DIVISION OF EMERGENCY COMMUNICATIONS.

17. Defendant CCSF's Department of Emergency Management consists of two divisions. The Division of Emergency Communications (DEC) provides 9-1-1 emergency dispatch services for Police, Fire, and the Emergency Medical System (EMS). The Division of Emergency Services (DES) coordinates disaster preparation and response planning in partnership with City agencies, non-profit entities, schools and the private sector. DES also

houses the Emergency Medical Services Agency (EMSA), which coordinates all of the components of the City's pre-hospital care system.

18. The San Francisco Department of Emergency Management (DEM) manages disaster preparation, mitigation, and response; 9-1-1 dispatch; and homeland security grant distribution for the City and County of San Francisco. DEM was created in 2006 by local legislation that reorganized the Emergency Communications Department and the Office of Emergency Services into a single agency.

19. DEM is composed of two divisions: Emergency Communications Division "(DEC") and Emergency Services. DEC or "9-1-1":

a. Receives approximately 3500 calls per day

b. Provides combined dispatch for:

- Police - 80% of calls

- EMS - 14% of calls

- Fire - 6% of calls

c. Utilizes a Computer Aided Dispatch (CAD) system

d. Utilizes an 800 MHz voice & data system to provide quality wireless communication

e. Serves as the Custodian of Records for Community Safety Camera data and 9-1-1 data

f. Activates the Tuesday at Noon outdoor public warning siren (managed by the Department of Technology)

20. DEC has over one hundred and fifty (150) employees. The following are some of the Essential Job Functions of DEC dispatchers such as Plaintiffs Doe and Raskin:

a. Receive emergency and non-emergency calls and efficiently gathers, evaluates, prioritizes, and documents information from callers.

b. Dispatch Police, Fire and EMS field units to specific locations using a computer aided dispatch system, multiple video display terminals, two-way radio dispatch console and related equipment.

c. Evaluate incoming reports of Police, Fire and EMS; immediately transmits complete and accurate information to appropriate field personnel.

d. Monitor, coordinate and accurately maintain the status of incidents and record of dispatched emergency service personnel and apparatus.

e. Receive and disseminate information from other law enforcement and emergency service computer networks related to jurisdictional requests for Police, Fire or EMS, or to notices of wanted persons, stolen property, warrants and all points bulletins and maintains confidentiality of information.

f. Maintain familiarity with area geography including major streets, buildings and recognizes circumstances that may pose hazards to public safety field units and the public.

g. Maintains up-to-date understanding of public safety policies and procedures for the DEM, Police, Fire, EMS and other emergency service providers.

h. Respond to routine and non-routine inquiries regarding Police, Fire, or EMS; properly classify and prioritize any report or complaint information and determines appropriate course of action; provides appropriate referrals as necessary.

i. Respond report and mobilize as necessary.

j. Work various eight-hour or 10-hour shifts, or longer, including days, nights, weekends, holidays and overtime.

21. Plaintiffs Jane Doe and Anne Raskin and other dispatchers working for Defendant CCSF are the first people to take 9-1-1 calls for Police or Fire assistance. It takes a great deal of training and dedication to provide this important public service for the City and County of San Francisco.

22. In particular, in order to work as a Dispatcher for Defendant CCSF, one must first complete rigorous training with The Commission on Peace Officers Standard and Training (hereinafter referred to as "POST"). Plaintiffs Jane Doe and Anne Raskin are informed and believe that POST was established by the Legislature in 1959 to set minimum selection and training standards for California law enforcement. The POST organization, with

more than 130 staff members, functions under the direction of an Executive Director appointed by the Commission.

23. Plaintiffs Jane Doe, Anne Raskin and other DEC Dispatchers were given the benefit of using of certain community computers located in their worksite for their personal and private benefit so long as it was not for an illegal purpose (as detailed in a July 24, 2009 DEM memo authored by Deputy Director Lisa Hoffman). Plaintiffs Jane Doe and Anne Raskin, and other DEC workers were allowed to use these computers during their breaks for their own personal and private use (e.g., to shop, access e-mails etc.). (Plaintiff Anne Raskin never availed herself of this benefit to check personal emails.)

24. Since Plaintiffs Jane Doe and Anne Raskin were told they may use certain computers for their own personal and private use, during their breaks or lunch, Plaintiffs Jane Doe and Anne Raskin had an explicit expectation of privacy in their use of these computers when accessing them for personal reason as allowed by the DEM policy.

25. Plaintiffs Jane Doe and Anne Raskin never gave anyone consent or authorizations to review, print-out, republish, track, or otherwise access their personal and private email communications.

26. Plaintiff Jane Doe exercised her rights under the DEM policy and occasionally used the computer during her breaks or lunch to check personal emails and engage in personal business while on breaks. In doing, so, she used her personal and private username and password.

27. Plaintiffs Jane Doe and Anne Raskin never gave their personal or private username or passwords to any Defendant.

## FACTUAL ALLEGATIONS OF PLAINTIFF JANE DOE

### A. 2002: PLAINTIFF JANE DOE JOINS DEFENDANT CCSF'S DEC MIDNIGHT SHIFT AND IS SUBJECTED TO BRUTAL GENDER-BASED DISCRIMINATION,

**BULLYING, HAZING AND HARASSMENT BY HER FEMALE SUPERIORS AND THEIR MINIONS.**

28. In 2002, Plaintiff Jane Doe commenced employment with Defendant CCSF DEC.

29. Plaintiff Jane Doe, a newly released Dispatcher, was on her third rotation of training when she was assigned to the DEC Midnight Shift (11PM to 7AM).

30. The Watch Coordinator for DEC Midnight Shift was Defendant Madsen. When Defendant Madsen was on duty, she was the most senior person in charge of the entire DEC. The exception being if more senior personnel were on site – which was rare.

31. Once Plaintiff Jane Doe joined the DEC Midnight shift, she quickly learned that it was not run like a proper government agency, but as Defendant Madsen's personal fiefdom and that hazing, bullying and harassment were the norm.

32. Then Dispatcher Defendant Heather Grives was Plaintiff Jane Doe's third rotation trainer.

33. Defendant Grives was very abusive to Plaintiff Jane Doe, often calling Plaintiff Jane Doe "stupid" or "bitch." Defendant Grives refused to assist Plaintiff Jane Doe when she needed help. Defendant Grives would tell Plaintiff Jane Doe to go home early as a way to set her up for disciplinary action. Plaintiff Jane Doe knew this would be career suicide so she would stay the entire shift. When Plaintiff Jane Doe was on a call dealing with the public, Defendant Grives would yell at Plaintiff Jane Doe to get off the phone when Defendant Grives wanted to talk to Plaintiff Jane Doe. Plaintiff Jane Doe was supposed to be given an hour of training each night, but instead Defendant Grives would leave Plaintiff Jane Doe alone to listen to radio traffic while Defendant Grives would visit with her friends.

34. While Plaintiff Jane Doe was being trained by then dispatcher Defendant Grives, in January 2003, other employees went to Deputy Director Glenn Ortiz-Schultz to complain about Defendant Grives's abuse toward Plaintiff Jane Doe. In response, Plaintiff Jane Doe was put with another trainer and successfully completed her training. However,

Defendant Grives never forgot that a complaint had been made about her and continued her campaign of harassment and retaliation against Plaintiff Jane Doe. Plaintiff Jane Doe complained about Defendant Heather Grives's abusive tactics.

35. In retaliation for Plaintiff Jane Doe's complaints about Defendant Grives, who was one of Defendant Madsen's pets, Defendant Madsen escalated the abuse toward Plaintiff Jane Doe. Defendant Madsen caused Plaintiff Jane Doe to be "unreleased" as a Dispatcher, twice, which, in turn, could have cost her job with Defendant CCSF. It was usually a supervisor function to monitor new people but Defendant Madsen made Plaintiff Jane Doe her personal "project."

36. Plaintiff Jane Doe's experience of the DEC Midnight Shift was that it operated with a great deal of gender discrimination, harassment and bullying. The employees (predominately female) working the DEC Midnight Shift under Defendant Madsen were expected to behave in a very subservient manner toward Defendant Madsen and her sentries. Dispatchers were in fear of Defendant Madsen, Defendant Grives, and Defendant Hillman. Plaintiff Jane Doe quickly learned that this subservient behavior was expected of her but she found it offensive and would not consent to this non-work-related gender based submission. Plaintiff Jane Doe paid the ultimate price for following the law: endless months of bullying and harassment. This hurtful and illegal conduct perpetuated by Defendant Madsen, Defendant Grives, and Defendant Hillman in the DEC Midnight Shift was adopted by other Dispatchers who sought to curry favor. Thus, the harassment and bullying was mimicked or carried out by subordinate employees who were "in favor" with Defendant Madsen.

37. Not surprising, males were not treated in the same sexist, abusive bullying manner that was directed toward Plaintiff Jane Doe.

38. Plaintiff Jane Doe was not alone in suffering the harassment and bullying. Plaintiff Jane Doe is informed and believes that this has been happening to other females for years; that other female employees have suffered gender-based harassment and discrimination. As a consequence, the retentions rate was very low as noted in a June 2008 comprehensive management study of DEM prepared the outside consulting firm MGT of

America, Inc., retained by Defendant CCSF. (That report specifically referenced a systemic intimidating atmosphere and a "hazing" environment.") Thus, Defendant CCSF had full knowledge the hazing, bullying, harassment and discrimination was occurring within the DEC, yet it did nothing to stop it.

39. Examples of the continuous severe and pervasive hazing and harassment that Defendants Madsen, Defendant Grives, Defendant Hillman, and some of the other dispatchers directed toward Plaintiff Jane Doe and others included:

- Bullying;
- Persistent psychological intimidation;
- Deeply hurtful and belittling comments,
- Persistent baseless criticism of work;
- Withholding resources necessary to work successfully;
- Eye-rolling, sighing, whispering, tongue-clucking and other body language designed to undermine Plaintiff Jane Doe and to send the message to other employees that Plaintiff Jane Doe was not a welcomed member of the Plaintiff Madsen's clique otherwise known as the DEC Midnight Shift;
- When Plaintiff Jane Doe worked the DEC Midnight Shift with Defendant Grives and Defendant Hillman, they shunned Plaintiff Jane Doe and tried to undermine her work for the City and County of San Francisco or made it extremely difficult for her to serve the City and the needs of the 9-1-1 callers;
- Defendant Madsen would micro-manage Plaintiff Jane Doe, speak to her in a dismissive and demeaning manner, loudly whisper hurtful thing about her to others, hyper-scrutinize Plaintiff Jane Doe's calls with a fine tooth comb to pick out minor and inconsequential matters.

40. Defendant Madsen, Defendant Grives, and Defendant Hillman demonstrated little concern for the safety of the City and 9-1-1 callers.

**B. <u>2003: PLAINTIFF DOE TRANSFERS OUT OF ABUSIVE DEC MIDNIGHT SHIFT</u>.**

30. Later in 2003, Plaintiff Jane Doe signed up for the DEC Swing Shift and flourished. Plaintiff Jane Doe went to DEC Swing Shift to get away from the harassment of the DEC Midnight Shift. This change was a financial hardship as it cost her dearly in income and additional commute costs because it was a five (5) day eight (8) hour shift instead of the 4/10's she worked on the DEC Midnight Shift.

41. A few years later, Plaintiff Jane Doe signed up for the DEC "Overlap:" Shift (hours of 5PM to 3AM) so that she could have Sundays off; unfortunately, the last four (4) hours of the DEC Overlap Shift overlapped with the DEC Midnight Shift. Thus, Plaintiff Jane Doe was exposed to her harassers once again.

42. In a transparent act of harassment and retaliation, Plaintiff Jane Doe was singled out to work mandatory overtime four (4) different times in six (6) months; once on Plaintiff Jane Doe's birthday, once on Father's Day, and two other times. One of Plaintiff Jane Doe's co-workers (a senior dispatcher) offered to work on Plaintiff Jane Doe's birthday and miraculously the overtime was no longer needed. Another time the scheduling supervisor came in and moved some things around and, suddenly, Plaintiff Jane Doe was not required to work the mandatory overtime. (As supervisors, they all have scheduling training, so Plaintiff Jane Doe's supervisors could have moved the schedule around as well.)

43. The renewed harassment on the DEC Mid-Night Shift was much like what she experienced before, but increasingly worse, and included a campaign of psychological abuse such as:

a. Bullying;

b. Shunning;

c. Micro-management;

d. Defamatory and hurtful gossip; and,

e. False and baseless work criticism;

44. Around 2005, the harassment and abuse was so severe that Plaintiff Jane Doe suffered physical manifestations in the form of unbearable back, shoulder and neck pain. Plaintiff Jane Doe had to take time off from work because of the physical manifestations from

the abuse she faced at work every single day from her colleagues. On or about February 28, 2005, Plaintiff went to Janice Madsen and pleaded with her to stop the harassment as it caused, Plaintiff to experience physical pain due to the stress. Defendant Madsen's response was, "I can make you work sixteen (16) hours a day if I want." The next day, March 1, 2005, Plaintiff went to see the workers compensation doctor who placed Plaintiff Doe on leave for about eleven (11) months for the work related injury.

45. In October 2008, Plaintiff became a Supervisor.

46. While working the DEC Midnight Shift as a Supervisor, Plaintiff Jane Doe observed that Defendants Heather Grives, Kym Dougherty, and Audrey Hillman would also cover for Defendant Madsen when she didn't show up for work. Similarly, Defendant Madsen would cover for them. This blatant misuse of City monies was brought to the attention of Defendant CCSF by Plaintiff Jane Doe and another Supervisor. Much to Plaintiff Jane Doe's shock, Defendant CCSF was not discreet about this whistle-blowing complaint and refused to take it seriously. There was no internal investigation of this matter even though it clearly had been going on for months if not years. Plaintiff Jane Doe's superior's (Defendant Madsen, Hillman and Grives) found out about the complaint and Plaintiff Jane Doe was subjected to further retaliation. Of note, it would have been a simple investigation for Defendant CCSF to research the issue raised by Plaintiff Jane doe, as employees had key cards that electronically recorded every time they entered or left a secure area. This type of outrageous abuse of City monies would be, in many other departments or organizations, an immediate ground for dismissal as it is tantamount to stealing.

47. During the period Plaintiff was a supervisor, Defendant Madsen, Defendant Grives, Defendant Dougherty and Defendant Hillman left Plaintiff Jane Doe alone for hours at a time in the police dispatch room and would not relieve Plaintiff Jane Doe for breaks.

48. During the period Plaintiff was a supervisor, Defendant Madsen, Defendant Grives, Defendant Dougherty and Defendant Hillman would spend several hours each night in the supervisor's room eating, playing on the internet, or chatting with their buddies.

49. Defendant Madsen, Defendant Grives, Defendant Dougherty, and Defendant Hillman would let dispatchers they favored come off the floor and hang out in the supervisor's room with them instead of working. This left the dispatch area under-staffed and stressed.

50. On or about December 31, 2008, Defendant Madsen asked Plaintiff Jane Doe, "What time is it that you think you are going home?" and then made Plaintiff Jane Doe stay an extra two (2) hours monitoring a hand held radio in a room where there is nothing happening . When Defendant Madsen did this type of thing to Plaintiff Jane Doe (and it happened often) she would do it in front of the other employees who would later taunt Plaintiff Jane Doe about how Defendant Madsen had it in for her.

### C. JANUARY 18, 2009: PLAINTIFF JANE DOE IS ASSIGNED TO DEC MIDNIGHT SHIFT AS A SUPERVISOR.

51. On January 18, 2009, Plaintiff Jane Doe was assigned to DEC Midnight Shift as a Supervisor. The very first night, Plaintiff Jane Doe is told by Defendant Grives and Defendant Hillman that, "*No one takes lunch breaks*," and if she wanted a break to, "*just leave the room.*"

52. Plaintiff Jane Doe was blown away by the directive because the police and fire dispatch rooms are supposed to have a supervisor present at all times. Plaintiff Jane Doe was not trained as a Fire Dispatch Supervisor so she was left alone as the sole supervisor, night after night, in the police dispatch and call taker room-- often without relief

53. The DEC Midnight Shift harassment was ongoing even though Plaintiff Jane Doe had been elevated to Supervisor. Plaintiff Jane Doe (and others) made repeated complaints to her superiors about the harassment she was experiencing from the DEC Midnight Shift gang but nothing was done and the retaliation and harassment continued.

54. For example, Plaintiff Jane Doe was excluded and not allowed to participate in any social activities with the other Supervisors, including birthday parties, mini-events, and feeds. Plaintiff Jane Doe was excluded from conversation with other shift Supervisors and Supervisor specific training. Plaintiff Jane Doe often heard her "co-workers" snickering and

talking about her behind her back. Plaintiff Jane Doe was not given any additional training by Defendant Madsen.

55. Beginning in January 2009 through July 2009, Plaintiff Jane Doe was continuously denied breaks or lunches because Defendant Hillman, Defendant Dougherty and Defendant Grives spent their time in the office chatting on the internet or throwing parties, leaving Plaintiff Jane Doe to be the only shift Supervisor.

56. On Sunday January 19, 2009, at approximately 1:00AM, Defendant Madsen and Defendant Dougherty ran out of the building hand-in-hand giggling in front of subordinates so they could put a phony stolen vehicle report on a certain fire-fighter's personal vehicle that was parked at a fire station.

57. Defendant Madsen and Defendant Dougherty ran this fire-fighter's license plates on Defendants CCSF's computer system which is a direct violation of the Criminal Law Enforcement Telecommunications Systems (CLETS) and invasion of his privacy under California Constitution Article 1, § 1. Management was made aware of this incident by Plaintiff Jane Doe and another Supervisor. Again, nothing was done

58. On Monday January 26, 2009, Plaintiff Jane Doe asked Defendant Madsen to show her how to work the radio system in case of an emergency. Defendant Madsen responded that since they had moved into temporary quarters, that the system was set up differently and that she did not know how it worked.

59. During the month of February 2009, Defendant Madsen called in sick three (3) Sunday's in a row and Defendant Hillman frequently left two (2) hours early on Sunday mornings to go to church.

60. Defendant Hillman is frequently 1 to 2 hours late coming to work, yet this was not always reflected in the PeopleSoft™ (payroll software).

61. On January 31, 2009, there is no Watch Coordinator on duty and Plaintiff Jane Doe and Supervisor Cynthia Haynes were left alone to cover the DEC. Neither Plaintiff Jane Doe nor Supervisor Cynthia Haynes received a break or lunch during the entire ten hour shift.

62. On March 9, 2009, Defendant Madsen read aloud an email from the computer in the police dispatch room. The email was sent to her from Deputy Director Lisa Hoffmann regarding a job opportunity. Defendant Madsen became furious and started yelling out loud her thoughts about the email. She spent over an hour yelling and ranting. The dispatchers can heard her speaking disrespectfully about Deputy Director Lisa Hoffman.

63. On March 20, 2009, Defendant Hillman and Defendant Grives spent over three (3) hours in the office playing on the internet and socializing. In the meantime, the fire dispatch room was unsupervised and Plaintiff Jane Doe was the sole supervisor in the Police/Call taker Room supervising approximately sixteen (16) dispatchers.

64. On March 21, 2009, Plaintiff Jane Doe and Supervisor Cynthia Haynes were left alone to supervise dispatch. Once again, no breaks or no lunches in a ten hour shift.

65. On March 20, 2009, Defendant Hillman and Defendant Grives spent over four (4) hours in the office playing on the internet and socializing. In the interim, the fire dispatch room was unsupervised.

66. On March 29, 2009, Defendant Hillman and Plaintiff Jane Doe had to deal with two employees who have gotten into a heated verbal argument. That left none to cover dispatch. Once again, Plaintiff received no lunch and only one twenty (20) minute break

67. Sometime during March or April, 2009, Plaintiff Jane Doe spoke to Deputy Director Lisa Hoffmann and Operations Manager Cecile Soto about the behavior on the DEC Midnight Shift. Plaintiff Jane Doe told them Defendant Madsen was rarely present and there were inaccuracies as to her time at work in the Defendant DEC's time-keeping system ("PeopleSoft"). That is, Defendant Madsen was getting paid for time not worked. Deputy Director Lisa Hoffmann and Operations Manager Cecile Soto assured Plaintiff Jane Doe that they would pop in unannounced and keep an eye on the shift but they only did it once (each).

68. Plaintiff Jane Doe is informed and believes that Deputy Director Lisa Hoffmann and Operations Manager Cecile Soto told Defendant Madsen about Plaintiff Jane Doe's complaints. Once again, Plaintiff was subjected to retaliation.

69. On April 10, 2009, Defendant Hillman and Plaintiff Jane Doe are left alone to supervise the entire DEC. Again, no breaks and no lunch.

70. On April 11, 2009, Defendant Hillman and Plaintiff Jane Doe are left alone to supervise the entire DEC. Again, no breaks and no lunch.

71. On April 17, 2009, Defendant Grives tries to find fault with Plaintiff Jane Doe's schedule in front of Watch Coordinator Carol Bernard and Defendant Hillman. On the same night, there is a big party in the supervisor's office. Defendant Grive's daughter is present in the office using one of Defendant CCSF's computers. The CCSF computers contained sensitive information and are only supposed to be accessed by CLETS-cleared personnel (which her daughter was not). Plaintiff Jane Doe was the only Supervisor on duty in the police dispatch room.

72. On or about April 17, 2009, Plaintiff Jane Doe informed Watch Coordinator Carol Bernard how she has been harassed by Defendant Grives and Defendant Hillman. Instead of investigating the matter, or taking corrective action, Watch Coordinator Carol Bernard dismisses Plaintiff Jane Doe's complaint by saying, "*Don't give them [Defendants Grives and Hillman] anything to complain about.*"

73. On April 18, 2009, Defendant Hillman and Defendant Grives hang out at the office from 1AM until after 3:30AM playing on the internet and socializing. Meanwhile, no one is supervising the fire dispatch room.

74. On April 18, 2009, Supervisor Cynthia Haynes and Plaintiff Jane Doe are the only supervisors working and do not receive either a break or a lunch.

75. April 24, 2009, Defendant Hillman and Defendant Grives are in the supervisor's office for over three (3) hours socializing and playing on the internet. Defendant Hillman disappears until 4:40AM.

76. May 6, 2009, Defendant Hillman spends from 11PM to 12:30AM in the office talking to Eileen David (her friend who is a dispatcher who should have been on the floor working). Then, she spent until 3AM in the office on the internet. No lunch for Plaintiff Jane Doe.

77. May 9, 2009, Supervisor Cynthia Haynes and Plaintiff Jane Doe work a ten (10) hour shift without any break or lunch.

78. May 10, 2009, Supervisor Cynthia Haynes and Plaintiff Jane Doe work the floor with no lunch hour. Watch Coordinator Carol Bernard spent the entire night in her office and did not give Supervisor Cynthia Hayne or Plaintiff Jane Doe a break.

79. May 15, 2009, Defendant Hillman and Defendant Grives are in the office on the internet until 3:21AM. Plaintiff Jane Doe receives no breaks or lunch.

80. May 16, 2009, Defendant Hillman came in 1/2 hour late.

81. May 22, 2009, Defendant Hillman and Defendant Grives are in the supervisor's office socializing and playing on the internet until after 3AM. Plaintiff Jane Doe does not receive break until 3:30AM and no lunch.

82. On or about May 23, 2009, two call-takers on the DEC Midnight Shift received "Pink Slips" (termination notices) and were expected to complete their shift. Plaintiff Jane Doe was put in the untenable position of having to work with the disgruntled call takers after they received their Pink Slips. The Swing Watch Coordinator instructed Plaintiff Jane Doe not to discuss the Pink Slips because the DEC Midnight Watch Coordinator were not present. However, the Pink-Slipped employees were upset, refused to plug-in and take the 911 calls. This was a serious concern to Plaintiff Jane Doe so she tried to resolve the situation by speaking to the Pink-Slipped employees by expressing her personal empathy for their situation. Simultaneously, Plaintiff Jane Doe encouraged them to plug-in to answer the 911 calls. They refused. One went home and the other left the area upset. Plaintiff Jane Doe's primary concern was the safety of the community and her duty to the City and County of San Francisco.

83. When the Midnight Watch Commander Carol Bernard came on board, two and half hours late, she falsely accused Plaintiff Jane Doe of being insensitive. In reality, Plaintiff Jane Doe was sensitive and was only acting in the best interest of the safety of the citizens of the City and County of San Francisco. Plaintiff Jane Doe is accused of being "insensitive" by Watch Commander Carol Bernard for motivating the call takers that she is supervising to plug

in and take calls after the call takers have been notified that they had been laid off. Again, Plaintiff Jane Doe was concerned about public safety and that on Friday nights; every call taker needs to be plugged in to take 911 phone calls.

84. May 29, 2009, only Defendant Grives and Plaintiff Jane Doe were on duty as supervisors. Defendant Grives spends several hours in the supervisor's office not working for the City and not supervising the fire dispatch room.

85. June 5, 2009, only Defendant Grives and Plaintiff Jane Doe were on duty as supervisors. Once again, they did not receive breaks or lunch.

86. June 6 and 7, 2009, only Supervisor Cynthia Haynes and Plaintiff Jane Doe were on duty as supervisors. Once again, they did not receive a breaks or lunch.

87. June 19, 2009, only Defendant Hillman and Plaintiff Jane Doe were on duty as supervisors. Once again; they did not receive a breaks or lunch.

88. July 2, 2009, only Defendant Grives and Plaintiff Jane Doe were on duty as supervisors. Once again they did not receive a breaks or lunch.

89. July 3, 2009, only Supervisor Cynthia Haynes and Plaintiff Jane Doe were on duty as supervisors. Once again, they did not receive a breaks or lunch.

90. July 10, 2009, Defendant Grives and Defendant Hillman are in the office on the internet for several hours and did not perform work for the City. Plaintiff Jane Doe never received a lunch break

91. On average during the period between Januarys to July 2009, Plaintiff Jane Doe only received a lunch hour once a week and very few rest breaks.

## C. JULY 2009: PLAINTIFF JANE DOES LEAVES DEC MIDNIGHT SHIFT (AGAIN).

92. In July 2009, on Plaintiff Jane Doe's last day working the DEC Midnight Shift, she was in the Supervisor's office and as she leaves, Defendant Kym Dougherty remarked to the other supervisors, *"I am so glad I don't have to work with that bitch anymore."*

93. In Thanksgiving 2009, one of Plaintiff Jane Doe's coworkers put together a potluck at work. Against Plaintiff Jane Doe's objections (for obvious reasons [i.e., safety] and because she is a vegetarian). Another supervisor fried turkey and left grease on the back patio. Someone slipped in the grease and was injured. The Midnight Watch Coordinator Carol Bernard became incensed and wrote a scathing manifest calling all DEC Swing Watch Supervisors negligent and requested a full investigation of the matter. Plaintiff Jane Doe's Supervisors and coworkers are certain that Watch Coordinator Carol Bernard retaliated against all of them because of her disdain for Plaintiff Jane Doe (even though she had nothing to do with the turkey).

94. December 31, 2009, Defendant Madsen calls Defendant Grives to come in early at 7:00PM, two hours early for her scheduled shift even though they were not busy and over-staffed. Defendant Grives comes in at 7:30PM. The PeopleSoft™ time-keeping software reflects overtime from 7PM – a full half hour of overtime that she did not work. There was finally a complaint by another Supervisor and the time was changed.

95. On the same night, Plaintiff Jane Doe came into work even though Plaintiff Jane Doe had stomach issues and let her manager know that she wasn't feeling well. Defendants let another Supervisor leave early to go to a party, but Plaintiff Jane Doe had to stay until the end of her shift even though she was ill.

96. In mid-December 2009 Plaintiff Jane Doe received a report that when she left the Supervisor's bridge in the dispatch room, Defendant Grives called Plaintiff Jane Doe a "bitch" loud enough for a dispatcher to hear who was working a channel (and had headsets on).

**D. DEFENDANTS RETALIATED BY HACKING PLAINTIFF'S PERSONAL AND PRIVATE EMAIL ACCOUNT AND CIRCULATING PRIVATE AND CONFIDENTIAL EMAILS IN A CONCERTED EFFORT TO GET COMPLAINT FIRED.**

97. On November 26, 2009 Plaintiff Jane Doe is told that she was the subject of an internal investigation.

98. On November 27th, Plaintiff Jane Doe attends a meeting with the union representative Ron Davis and Terry Daniels from DHR to discuss the investigation.

99. In this meeting, Terry Daniels informed Plaintiff Jane Doe that Defendant Madsen sat down at one of the community computer in a supervisor's office and "happened to find" eight (8) or nine (9) emails up on the screen in full view for her to see. Terry Daniels told Plaintiff Jane Doe this happened on October 18, 2009. Purportedly, these emails all came from Plaintiff Jane Doe's personal Yahoo!™ account. Terry Daniels told Plaintiff Jane Doe that her Yahoo!™ account had a box that was checked that kept her logged on, and that Plaintiff Jane Doe allegedly "forgot" to hit the "sign off" button. Thus, when Defendant Madsen went to use the computer, it showed Plaintiff Jane Doe as still logged on, so "she decided to snoop." According to Terry Daniels, the emails were dated from September 2008 to July 2009. According to Terry Daniels, Defendant Madsen, "only" printed-out nine (9) or (10) emails but DEC was only "concerned" about two (2) of the emails. Terry Daniels showed the emails to Plaintiff Jane Doe and Ron Davis. Plaintiff Jane Doe expressed extremely confidential, personal and private matters in these emails.

100. Incredibly, Defendant CCSF had full knowledge for over six (6) weeks that Plaintiff Jane Doe's private and confidential email account had been hacked and did not tell her – all the while knowing that extremely confidential, sensitive, personal and private information about Plaintiff Jane Doe's person, family members, health, finances, and third party privacy rights, had been callously violated and exposed to others without Plaintiff Jane Doe's (or third parties') consent. Further, it was clear from looking at the dates of the emails, that Defendant Madsen had perused over a thousand emails, which had to have taken hours if not days, in order to cull out these few emails that Defendant Madsen "thought" were of "concern."

101. Matters described in these preceding paragraphs, regarding Plaintiff Jane Doe's Yahoo! Email account, will be referred to generally at the "Email Incident,"

102. Defendant Madsen had to search over 1000 emails in Plaintiff Jane Does' Yahoo! account to find the ones she used to make her complaint. Of even greater concern was

what emails if any, did Defendant Madsen create and send out in Plaintiff Jane Doe's name? None of the emails "at issue" were written while Plaintiff Jane Doe was at work. Further, Plaintiff Jane Doe is informed and believes that Defendant Madsen lied about how many emails she printed.

103. Plaintiff Jane Doe is informed and believes that Defendant Madsen willfully, maliciously and with intent to hurt, printed out, discussed, and distributed many other emails from Plaintiff Jane Doe's Yahoo!™ email account, showed them to others, read them to others, humiliated and defamed Plaintiff Jane Doe, and tried to get Plaintiff Jane Doe disciplined or fired. This is was blatant retaliation because Plaintiff Jane Doe made complaints about Defendant Madsen.

104. Months later, on April 29, 2010, Plaintiff Jane Doe learned that Defendant Dougherty and possibly Defendant Grives and Defendant Hillman were part of the Email Incident; that they, too, participated in scanning Plaintiff Jane Doe's email account, reading her private confidential emails, intruding upon her innermost private thoughts, reading emails from third-parties that Plaintiff Jane Doe had received, violating Plaintiff Jane Doe and others privacy rights, reading Plaintiff Jane Doe's confidential financial information, reading Plaintiff Jane Doe's confidential medical information and, possibly, creating and distributing emails in Plaintiff Jane Doe's name without her knowledge. Plaintiff Jane Doe was beyond devastated to learn of this new information.

105. As soon as the emails were distributed and talked about throughout Plaintiff Jane Doe's workplace, without restriction, Plaintiff Jane Doe's work life went from horrible to hellish.

106. Plaintiff Jane Doe asked her union rep to file a counter-complaint for harassment and demanded the Defendant CCSF bring in the computer personnel to determine the extent of the breach. Plaintiff Jane Doe was expressly assured that Defendant CCSF's computer personnel would do a thorough investigation.

107. Meanwhile, Plaintiff Jane Doe's co-workers went from supportive and respectful, to angry, hostile and vindictive toward Plaintiff Jane Doe because it disrupted the

work schedules. Work schedules are set every six months and since Plaintiff Jane Doe could not work with Defendant Madsen, someone else had to get bumped to midnights and this made the other employees mad.

108. Prior to the Email Incident, and except with her harassers (the individual Defendants), Plaintiff Jane Doe had a great reputation at work and after the Email Incident, no one would look Plaintiff Jane Doe in the eye. Her career was ruined. The viscous attacks on her person, invasion her rights and privacy has affected Plaintiff Jane Doe greatly. Plaintiff Jane Doe loved her job and now she can barely get up to go to work.

**E. DECEMBER 4, 2020: PLAINTIFF JANE DOES FILES A POLICE REPORT.**

109. On December 4, 2009, Plaintiff Jane Doe filed a complaint with the San Francisco Police Department about the Email Incident.

**ON DECEMBER 7, 2009 PLAINTIFF JANE DOE FILES A FORMAL HARASSMENT COMPLAINT – BUT RETALIATION CONTINUES.**

110. On or about December 7, 2009, Plaintiff Jane Doe filed a formal harassment complaint with her department concerning Email Incident.

111. This complaint states as follows:

*This memorandum serves as a preliminary written response to the meeting held on Friday, December 4, 2009 concerning the investigation into my alleged "unprofessional workplace conduct." I am incensed that I am the subject of anything other than a huge apology. I insist upon a full inquiry into the breach of my privacy: How is it possible that not one person made aware of this incident possesses the very*

*characteristics-a basic understanding of privacy and respect among them-that are essential in positions of leadership? Each of these people failed to recognize that my privacy was violated and that the person or people who sat pouring over my personal email account should be the sole focus of any investigation. To add insult to injury, I am being charged with unprofessional workplace conduct because people illegally accessed printed communications contained in my PERSONAL EMAIL ACCOUNT. That management has been aware of this breach for several weeks yet took NO STEPS to advise me of such is unconscionable. Each and every person with knowledge of this breach had a duty to warn me that my privacy was violated. It is beyond absurd to state that "I brought the email into the workplace." That is akin to saying that because I left my purse open with money in it it's my fault that it was stolen. Moreover, I find it difficult to fathom how anyone could possibly believe that all those emails were open on the screen for the viewing pleasure of whoever sat down at the computer after me. There are many reasons-technical and logical alike-why that is impossible. Even had all those emails been visible, there exists no valid reason for anyone to look at them. Yet someone did just that. There are over 1500 emails in my account; it was rummaged through for a VERY long time. The perpetrator(s) not only violated my privacy, but also the privacy of many of my co-workers, family members, banks, creditors, doctors and DEC management, all of whom have corresponded with me via my personal email account. My inbox and my outbox were perused with the equivalent of a*

*fine-tooth comb. A person of reasonable moral fiber immediately would have closed the application. I need to know the exact date of this privacy breach so I can advise all my contacts to research any unusual communications that may have been sent without my knowledge. Since my account has a delete feature in both my inbox and my outbox, I will need information about any communications that may have been sent in my name and then deleted.*

*At this point in time I have no idea how far reaching this breach is. It is imperative that I be able to secure my privacy immediately. I need to know how many copies of emails from my account were produced. I cannot assume that the copies in your possession are the only emails that were printed.*

*For now, I am concentrating on my personal security. You are on notice that the knowledge that my very personal life has been fodder for a select group of bullies will be addressed. I cannot help but wonder how management would react if the deepest personal aspects of their lives were on display.*

*This trespass is the most recent in a long series of pointed attacks perpetrated by a select group of individuals, individuals whose outrageous behavior has gone unchecked for years. That management not only has not reprimanded such behavior but has let it flourish is downright negligent. I refuse to endure the harassment any longer.*

*I am not going to address the content of my email communications because it is irrelevant. I have filed a police report and will be supplementing the report as the*

*investigation progresses. I work alongside unprofessional, mean and vindictive people. That I should be further victimized and violated by the very people whose job it is to oversee the workplace is intolerable. I hope that steps can be taken so that I can begin to regain some modicum of trust in my employer. If not, I will have no choice but to explore my legal options.*

112. On Thursday January 13, 2010, Plaintiff Jane Doe went to Operations Manager Cecile Soto, the most senior person in management on site, because Plaintiff Jane Doe's union steward was concerned that co-workers were talking about the investigation openly in front of subordinates. Instead of addressing the problem, Operations Manager Cecile Soto reprimanded Plaintiff Jane Doe.

113. On Friday January 14, 2010, Operations Manager Cecile Soto pulled Plaintiff Jane Doe into the manager's office, in front of all the staff, reprimanded Plaintiff Jane Doe for talking about the investigation.

114. On January 22, 2010, it was reported to Plaintiff Jane Doe by another Supervisor that two DEC Midnight Shift Supervisors Defendant Doherty and Wayne Propalis were loudly discussing Plaintiff Jane Doe's complaint and the Email Incident on the operation bridge. (It is in the middle of the dispatch room). They berated and defamed Plaintiff Jane Doe. Wayne Propalis started a petition to keep Plaintiff Jane Doe on the DEC Midnight Shift, even though everyone was told not to discuss this situation, Plaintiff Jane Doe was the only one to be repeatedly reprimanded and yelled at by Operations Manager Cecile Soto in front of other workers; apparently Plaintiff Jane Doe was the only who was expected to stay silent.

115. Incredibly, in January 2010, Plaintiff Jane Doe received a disciplinary action in the form of Formal Retraining "Unprofessional Conduct" for notifications that were not made by dispatchers under her supervision. There was no way possible that Plaintiff Jane Doe could have known about these notifications. She was never interviewed and it occurred on September 5, 2009. Dispatchers make mistakes all the time and they do not write up the

Supervisors for their mistakes. This Disciplinary Action was retaliatory just to make Plaintiff Jane Doe look bad. The DEC policy and practice mandates that employees be informed within 30 days of an investigation – not four months later. The matter was later dropped.

116. Plaintiff Jane Doe had a clean record-- only one investigation in 7 years; now all of a sudden she is been involved in four (4) since September 2009.

117. On about January 22, 2010, Plaintiff Jane Doe went to the Defendant CCSF's Human Resource Department and made a complaint. Defendant CCSF's Human Resource Department told her that it was not only harassment, but Plaintiff was a "whistle-blower" because they were cheating the City out of money.

**G. <u>Defendant Refuse to Return the E-Mails Back to Plaintiff Jane Doe</u>**

118. On February 17, 2010, "spoliation of evidence warning" letter from Plaintiff Jane Doe's counsel was sent to letter to Defendant Madsen and others demanding, among other matters, that she:

a. Immediately retract any complaints against Plaintiff Jane Doe that are based on any email or information that was surreptitiously and illegally obtained from Plaintiff Jane Doe's' private email account;

b. Immediately retract all defamatory statements that she made regarding Plaintiff Jane Doe; and,

c. Immediately return, any and all copies of any e-mails that she had in her possession, custody and control regarding Plaintiff Jane Doe's and immediately destroy any electronic copies on her computer or elsewhere.

119. Defendant Madsen and Defendant CCSF did not respond or comply with this demand.

120. A similar letter was sent to the Director of DEM, Vicki Hennessy, and likewise, there no compliance; nothing was returned and no assurances were made about all the private emails that were taken from Plaintiff Jane Doe without her consent.

121. To this date: No meaningful or effective investigation has ensued (had there been one, Plaintiff Jane Doe and other key witnesses would have been interviewed and they were not) and nothing was done to stop the re-publishing of these emails. Director of DEM, Vicki Hennessy simply sent a curt response that they had investigated and Plaintiff Jane Doe's claims had no merit.

122. On April 29, 2010, Plaintiff Jane Doe and her Union Representative Ron Davis met with Director of DEM, Vicki Hennessey. Director of DEM, Vicki Hennessy said she spoke to DHR and the City Attorney. The findings were that they essentially, "do not care what another employee does in an email account that it is not the responsibility of the Defendant CCSF." They said that Plaintiff Jane Doe inadvertently left her email account and that what Defendant Madsen did in her account they do not want to get involved in. They said that Defendant Madsen told them that she felt the emails were work related and therefore within her scope of authority to look at. Despite the lack of an investigation, they said they had no reason to doubt Defendant Madsen's story that the emails were "in plain view." The person that saw them first was Defendant Dougherty who then brought them to Defendant Madsen's attention. They would not answer Plaintiff Jane Doe's questions about what Defendants Madsen and Defendant Doherty did when they were in Plaintiff Jane Doe's Yahoo! ™ Account.

123. According to Director of DEM, Vicki Hennessy, the server information was saved but not gone through because Defendant CCSF determined, "it wasn't DEC's job to do so." Even though they did not check the computer, Director of DEM, Vicki Hennessy said the Plaintiff Jane Doe's complaint against Defendant Madsen was unfounded.

## FACTUAL ALLEGATIONS OF PLAINTIFF ANNE RASKIN

124. Plaintiff Anne Raskin Is Senior Dispatcher with Defendant CCSF.

125. Plaintiff Raskin commenced employment on June 5, 2006.

126. Plaintiff Anne Raskin currently works the DEC Day shift.

127. Like Plaintiff Jane Doe, Plaintiff Anne Raskin suffered discrimination and harassment in a hostile work environment at the hands of her supervisors and co-workers with seniority at the Department of Emergency Management (DEM) of the Defendant City and County of San Francisco because of her sex (female).

128. In addition, Plaintiff Anne Raskin received no assistance or support from supervisory staff while on DEC Midnight Shift after the email incident, in a job that requires such, leaving her wide open for neglect of duty as is it humanly impossible to dispatch or train proficiently without assistance.

129. This discrimination and harassment culminated on or about October 18, 2009, when Defendant Madsen and Defendant Dougherty, both supervisors of Plaintiff Anne Raskin, used DEM time and resources to access the private email account of Plaintiff Jane Doe (a co-worker of Plaintiff Anne Raskin) without Plaintiff Jane Doe's authorization. Defendant Madsen and Defendant Dougherty reviewed, printed, and republished private and confidential emails between Plaintiff Jane Doe and Plaintiff Anne Raskin.

130. Plaintiff Anne Raskin never gave consent that anyone could read her personal and private emails.

131. Because of Plaintiff Jane Doe and Plaintiff Anne Ruskin's gender (female), Defendant Madsen and Defendant Dougherty violated Plaintiff Anne Raskin's privacy through the unauthorized review of her personal emails.

132. This harassment and invasion of privacy damaged Plaintiff Anne Raskin's standing within the DEM.

133. Plaintiff Anne Raskin was mentioned in the complaints of harassment filed by Plaintiff Jane Doe in relation to the October 18, 2009 event. Since then, Plaintiff Anne Raskin has faced heighten scrutiny, undue and untrue criticism and reprimands, and shunning by her coworkers. Before the "Email Incident" Plaintiff was being groomed for promotion, allowed to attend a lot of training and meeting, and embraced by management. After the "Email Incident," and Plaintiff Anne Raskin's personal and private emails with Plaintiff Jane Doe were downloaded and published around the department, Plaintiff Anne Raskin became

"persona non grata" and received a Notice of Investigation, initiated by Bernard. The opportunities for advancement were withdrawn and she has been denied every class she has asked to take.

134. Before the "Email Incident," Plaintiff Anne Raskin had years of no behavioral complaints from either the citizenry or public safety. This notice of investigation was clearly retaliatory.

135. Plaintiff Anne Raskin realized that to protect herself, and for her own safety she had to move to day shift, and in fact the 0900-1900 watch which effectively eliminates all contact with Midnight shift who arrive at 2100 and stay until 0700. Plaintiff Anne Raskin has been there since March, 2010. The resulted in a $500 month cut in pay.

136. The ongoing campaign of discrimination, harassment, hostile work environment, and retaliation Plaintiff Anne Raskin suffers is rooted in the fact that she is a female who refused to make overtures to curry favor with Defendant Madsen, Defendant Dougherty and other members of the DEC staff. Plaintiff Anne Raskin is far from alone in experiencing this harassment and discrimination. Plaintiff Anne Raskin is informed and believes that female subordinates to Defendant Madsen, Defendant Dougherty, Defendant Bernard, Defendant Grives, Defendant Hillman and other female Supervisory members, whose names at this time are unknown, of the DEC staff are subject to discrimination, harassment and a hostile work environment if the subordinate females, including but not limited to Plaintiff Anne Raskin, refuse to make overtures to curry favor with the aforementioned Supervisors.

137. Plaintiff Anne Raskin is informed and believes that male subordinates do not suffer consequences for refusing to submit to Defendant Madsen and the other aforementioned female Supervisors. Defendant CCSF knew, or had it complied with state and federal law, should have known, that Plaintiffs Jane Doe and Anne Raskin's Supervisors, including Defendant Madsen and Defendant Dougherty, and other employees had a propensity to harass, discriminate and retaliate against other women, based on their past

conduct and based on Defendants' management's direct knowledge of harassing conduct committed by Plaintiffs' supervisors and other employees.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF THE FEDERAL STORED COMMUNICATIONS ACT**

**18 U.S.C. §§ 2701 to 2711**

(Against all Defendants)

138. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct claim for relief, Plaintiffs complain against Defendants and each of them as follows:

139. The Stored Communications Act (SCA)[1] was passed by the United States Congress in 1986 as part of the Electronic Communications Privacy Act, and is codified at 18 U.S.C. §§ 2701 to 2711.

140. Yahoo!™ is an electronic communication service. Plaintiff Jane Doe owned an email account serviced by Yahoo!™ that could only be accessed by use of her personal, private and confidential username and password. Yahoo!™ provided confidential private storage of Plaintiff Jane Doe's incoming and outgoing electronic communications. Plaintiff Jane Doe has a reasonable expectation of privacy as to the ingoing and outgoing emails that were stored by Yahoo!™ in her electronic email account that was maintained by Yahoo!™.

141. Defendants violated the SCA as alleged herein by intentionally accessing Plaintiff Jane Doe's personal, private and confidential Yahoo!™ email account without authorization.

142. As a proximate and legal cause of Defendants unlawful violation of the SCA, Plaintiff suffered damages including but not limited to shame, embarrassment, invasion of her right of privacy, and of denial of her state and federal constitutional rights.

143. Plaintiffs Jane Doe and Anne Raskin are persons aggrieved by Defendants' violation of the SCA because the conduct constituting the violation, as alleged herein was

engaged in with a knowing or intentional state of mind. Accordingly, Plaintiffs seek recovery as follows:

(1) Such preliminary and other equitable or declaratory relief as may be appropriate; and,

(2) The Court may assess as damages in the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000. If the violation is willful or intentional, the court may assess punitive damages.

In the case of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the Court.

WHEREFORE, Plaintiffs request relief as herein set forth in the Prayer.

## SECOND CLAIM FOR RELIEF

VIOLATION OF CALIFORNIA LABOR CODE §98.6; 1102.5; 6310

(Plaintiffs against Defendant CCSF AND Does 1 through 20)

144. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complain against Defendants and each of them as follows:

145. California Labor Code § 98.6(a) provides that:

"No person shall discharge an employee or in any manner discriminate against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter… or because the employee [ ] has filed a bona fide complaint or claim…"

146. California Labor Code § 98.6(b) provides that:

"Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of his or her

employment…is entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer."

147. California Labor Code § 6310 prohibits any manner of discrimination or retaliation against any employee because the employee has made a complaint to a governmental agency in reference to employee health and safety.

148. California Labor Code § 1102.5 provides that:

> a) An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.
>
> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.
>
> (c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.
>
> (d) An employer may not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.
>
> (e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

(f) In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

(g) This section does not apply to rules, regulations, or policies which implement, or to actions by employers against employees who violate, the confidentiality of the lawyer-client privilege of Article 3 (commencing with Section 950), the physician-patient privilege of Article 6 (commencing with Section 990) of Chapter 4 of Division 8 of the Evidence Code, or trade secret information.

149. Plaintiffs lodged numerous complaints with Defendant CCSF, including Plaintiff Jane Doe's complaint with the San Francisco Police Department regarding the unsafe work environment, violation of state and federal law, the misuse of government funds, unlawful gender-based harassment and discrimination. These complaints included his concerns for the health and safety (e.g., physical and emotional distress caused by Defendants' actions) of those working under the abusive leadership of control of Defendants Madsen, Hillman, Dougherty and Grives, including Plaintiff Jane Doe. These complaints have been continuing to date.

150. Instead of responding to Plaintiff Jane Doe's complaints in a meaningful manner, Defendants Defendant CCSF and Does 1 to 20 discriminated and retaliated against Plaintiff Jane Doe by, among other matters, disciplining, bringing false charges, reprimanding, and invading her privacy, in violation of the law.

151. As a direct, foreseeable and legal result of Defendants' conduct, Plaintiffs have suffered and continues to suffer substantial damages including losses in earnings, bonus compensation, seniority, retirement and other employment benefits in an amount to be proven at trial.

152. As a direct, foreseeable and legal result of Defendants' conduct, Plaintiffs have suffered and continue to suffer humiliation, embarrassment, mental, emotional distress and discomfort, all to Plaintiffs detriment in an amount to be proven at trial.

153. By reason of Defendants' unlawful conduct, and in seeking enforcement of important rights affecting the public interest, Plaintiff has incurred and will incur legal expenses including attorneys' fees and costs to remedy the wrongs perpetrated by Defendants and each of them. Plaintiff Jane Doe is therefore entitled to reasonable attorneys' fees and costs as a matter of law pursuant to, interalia California Code of Civil Procedure § 1021.5, et seq.

WHEREFORE, Plaintiff Jane Doe requests relief as herein set forth in the Prayer.

## THIRD CLAIM FOR RELIEF -- SUPPLEMENTAL

(INVASION OF PRIVACY – Against Individual Defendants and DOES 1 through 20)

154. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complains against Defendants and each of them as follows:

155. Article I, Section 1, of the California Constitution establishes each person's right to privacy in this State.

156. Plaintiffs Doe and Raskin at all times mentioned herein had a legally protected privacy interest in the email communications and email account described herein, and a reasonable expectation that her privacy would not be violated by Defendants.

157. A serious invasion of Plaintiffs Doe and Raskin's privacy occurred when, Defendants

158. As a proximate result of this invasion of privacy, and the extreme and outrageous conduct engaged in by Defendants, Plaintiffs suffered humiliation, mental anguish and extreme emotion and physical distress all to her general damage in an amount according to proof at trial.

159. Defendants Madsen, Hillman, Dougherty and Grieves' conduct as herein alleged was malicious and oppressive in that it was conduct carried on by him in a willful and conscious disregard of Plaintiffs Doe and Raskin's rights and subjected her to cruel and unjust hardship. Plaintiffs Doe and Raskin is therefore entitled to an award of punitive damages against Defendants Madsen, Hillman, Dougherty and Grives.

WHEREFORE, Plaintiffs Doe and Raskin pray for judgment against Defendants as is more fully set forth below.

**FOURTH CLAIM FOR RELIEF – SUPPLEMENTAL**

(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

160. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complains against Defendants and each of them as follows:

161. This is an action for damages pursuant to the common law of the State of California as mandated by the California Supreme Court in the decision of *Rojo v. Kliger* (1990) 52 Cal. 3d 65.Defendants engaged in extreme and outrageous conduct individually and in their managerial and supervisorial positions of authority over Plaintiffs Doe and Raskin, and terrorized and tormented Plaintiff as herein above alleged with the goal of causing her to suffer extreme duress, emotional distress, fright and intimidation.

162. Defendants engaged in the extreme and outrageous conduct herein above alleged with wanton and reckless disregard of the probability of causing Plaintiffs Doe and Raskin to suffer severe emotional distress.

163. As a proximate result of the extreme and outrageous conduct engaged in by Defendants, Plaintiffs Doe and Raskin suffered humiliation, mental anguish and extreme emotion and physical distress all to her general damage in an amount according to proof at trial.

164. Defendant's conduct as herein alleged was malicious and oppressive in that it was conduct carried on by Defendants in a willful and conscious disregard of Plaintiff's rights

and subjected her to cruel and unjust hardship. Plaintiffs Doe and Raskin is therefore entitled to an award of punitive damages.

WHEREFORE, Plaintiffs Doe and Raskin pray for judgment against Defendants as is more fully set forth below.

**FIFTH CLAIM FOR RELIEF – SUPPLEMENTAL**

VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT: DISCRIMINATION BASED ON SEX

(Against Defendant City and Does 1 through 10)

165. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complain against Defendants CCSF and DOES 1 through 10, only, each of them as follows:

166. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct claim for relief, Plaintiffs complains against Defendant City and Does 1 through 10 as follows:

167. California Government Code Section 12940(a) prohibits any employer or person from discriminating against any employee in the terms, conditions or privileges of employment, on account of that employee's sex. Defendants' conduct toward Plaintiffs, as described above, constituted discrimination on the basis of sex as prohibited by Government Code Section 12940(a).

168. As a direct, foreseeable and legal result of Defendants' discriminatory acts, Plaintiffs have suffered and continue to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiffs' damage in an amount to be proven at trial.

169. By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination and harassment free workplace for herself and the public at

large, Plaintiffs have incurred and continue to incur legal expenses and attorneys' fees. Plaintiffs are therefore entitled to reasonable attorneys' fees and litigation expenses. California Code of Civil Procedure 1021.5 and California Government Code §12900 et seq.

WHEREFORE, Plaintiffs request relief as set forth in the Prayer.

**SIXTH CLAIM FOR RELIEF -- SUPPLEMENTAL**

VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT:

SEXUAL HARASSMENT

(Against All Defendants)

170. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complain against Defendants, and each of them, as follows:

171. California Government Code Section 12940(j) prohibits an employer or person from harassing an employee on the basis of sex and sexual orientation. Government Code Section 12940(h) also requires an employer who knows or should have known of this harassment to take immediate and appropriate corrective action to stop such harassment, and to take all reasonable steps to prevent harassment from occurring.

172. In doing the acts and omissions set forth above, Defendants, and each of them, violated the California Government Code Section 12940(j) prohibitions against workplace harassment of employees based on their sex and sexual orientation.

173. As a direct, foreseeable and legal result of Defendants' discriminatory acts, Plaintiffs have suffered and continues to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and have suffered and continue to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiffs' damage in an amount to be proven at trial.

174. Defendants committed the despicable acts as herein alleged maliciously, fraudulently, and oppressively, with the wrongful intent of injuring Plaintiffs, and have acted

with an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs rights and emotional well being. Plaintiffs are therefore entitled to recover punitive damages from Defendants in an amount according to proof.

175. By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination and harassment free workplace for herself and the public at large, Plaintiffs have incurred and continue to incur legal expenses and attorneys' fees. Plaintiffs are therefore entitled to reasonable attorneys' fees and litigation expenses. California Code of Civil Procedure §1021.5 and California Government Code §12900 et seq.

WHEREFORE, Plaintiffs requests relief as set forth in the Prayer.

**SEVENTH CLAIM FOR RELIEF -- SUPPLEMENTAL**

VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT: FAILURE TO PREVENT DISCRIMINATION AND HARASSMENT

(Against Defendant CCSF and Defendants Does 1 through 10)

176. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiff complains against Defendant CCSF and Does 1 through 10 as follows:

177. California Fair Employment and Housing Act, Government Code Section 12940(k), places on employers an affirmative, statutory obligation to take all reasonable steps to prevent unlawful discrimination and harassment from occurring.

178. Defendants failed to take meaningful, effective and reasonable steps to ensure that discrimination and harassment would not occur in the workplace.

179. As a direct, foreseeable and legal result of Defendants' actions and omissions, Plaintiffs have suffered and continues to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and has suffered and continues to suffer humiliation, embarrassment, mental and

emotional distress, and discomfort, all to Plaintiff 's damage in an amount to be proven at trial.

180. By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination and harassment free workplace for herself and the public at large, Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses. California Code of Civil Procedure §1021.5 and California Government Code §12900 et seq.

WHEREFORE, Plaintiff requests relief as set forth in the Prayer.

**EIGHTH CLAIM FOR RELIEF -- SUPPLEMENTAL**

VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT: RETALIATION

(Against Defendant CCSF and Defendants Does 1 through 10)

181. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complain against Defendants CCSF and Does 1 through 10 as follows:

182. Defendants retaliated against Plaintiffs for having engaged in protected activity by objecting to the hostile work environment caused by Defendants, as well as for expecting Defendants to honor and abide laws designed to protect employee rights.

183. As a direct, foreseeable and legal result of Defendants' actions and omissions, Plaintiffs have suffered and continues to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and has suffered and continue to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiffs' damages in an amount to be proven at trial.

184. By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination and harassment free workplace for herself and the public at

emotional distress, and discomfort, all to Plaintiff 's damage in an amount to be proven at trial.

180. By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination and harassment free workplace for herself and the public at large, Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses. California Code of Civil Procedure §1021.5 and California Government Code §12900 et seq.

WHEREFORE, Plaintiff requests relief as set forth in the Prayer.

**EIGHTH CLAIM FOR RELIEF -- SUPPLEMENTAL**

VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT: RETALIATION

(Against Defendant CCSF and Defendants Does 1 through 10)

181. Plaintiffs incorporate by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a separate and distinct supplemental claim for relief, Plaintiffs complain against Defendants CCSF and Does 1 through 10 as follows:

182. Defendants retaliated against Plaintiffs for having engaged in protected activity by objecting to the hostile work environment caused by Defendants, as well as for expecting Defendants to honor and abide laws designed to protect employee rights.

183. As a direct, foreseeable and legal result of Defendants' actions and omissions, Plaintiffs have suffered and continues to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and has suffered and continue to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiffs' damages in an amount to be proven at trial.

184. By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination and harassment free workplace for herself and public at large,

Plaintiffs are therefore entitled to reasonable attorneys' fees and litigation expenses. California Code of Civil Procedure §1021.5 and California Government Code §12900 et seq.

WHEREFORE, Plaintiff requests relief as set forth in the Prayer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, prays judgment against Defendants, and each of them, as follows:

1. General and special damages in an amount according to proof, but in excess of the jurisdictional limit of this Court;

2. Statutory damages as allowed by law

4. Attorneys fees and costs of litigation, and multiplier, according to proof and as the law allows [California Code of Civil Procedure §1021.5; California Government Code §12940, et seq];

5. Declaratory and injunctive relief;

6. Punitive and exemplary damages against Defendants Madsen, Hillman, Grives and Dougherty;

7. Statutory penalties and interest as allowed under the law; and,

8. Such other and further relief as the Court deems just and proper.

Dated: October 18, 2010

SHEA LAW OFFICES

By:______________________

Mary Shea Hagebols
Attorney for Plaintiffs
JANE DOE and ANNE RASKIN

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: October 18, 2010

SHEA LAW OFFICES

By: ______________________________

Mary Shea Hagebols

Attorney for Plaintiffs

JANE DOE and ANNE RASKIN

4814-0077-1591, v. 1

4814-0077-1591, v. 2

PLAINTIFFS' COMPLAINT FOR DAMAGES/ REQUEST FOR JURY TRIAL

- 42 -